**Application of LeRoy P. WAHL and Lynn C. Adolphson.**
**Patent Appeals No. 7328.**

United States Court of Customs and Patent Appeals.
April 15, 1965.
Rehearing Denied June 17, 1965.

Smith, J., dissented.

Donald G. Welsh, Washington, D. C., William G. Ewart (Sherman J. Kemmer, Crystal, Minn., of counsel), for appellants.

Clarence W. Moore, Washington, D. C., (S. Wm. Cochran, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the examiner's rejection on prior art of claims 9–11 and 13–15 of appellants' application.[1] No claim has been allowed.

Appellants' invention relates to laminated insulation boards. The plies, which can be cellulosic material such as straw, old newspaper, partially digested wood fibers etc., are bonded with an adhesive which is a mixture of vegetable protein flour and melamine formaldehyde resin. It is conventional to bond plies together with an adhesive such as soybean flour. However, such adhesive bonds fail readily upon exposure to temperature variations and moisture. Appellants' blend of soybean flour and melamine formaldehyde when used to bond plies of an insulation board is resistant to moisture and temperature variations. Claims 13 and 14 reproduced below are illustrative of claims to the insulation board and its method of preparation.

"13. The method of preventing the separation of insulation board lamina under varying conditions of moisture, heating and freezing comprising the steps of preparing a mixture of about 80 to about 95 parts soy flour having at least a 40% protein content with about 5 to about 20 parts unmodified melamine formaldehyde resin in a water solution, the mixture being present in the water in an amount of from about 20% to about 35% solids content, applying a coating of the said adhesive mixture to an insulation board lamina, applying a second insulation board lamina to said adhesive, subjecting the said lamina and said adhesive coating to a pressure of at least 5 pounds, and effecting a bonding sufficient for cutting and grooving of the lamina within a drying period of about 1 hour.

"14. An improved composite fiberboard consisting of laminated plies bonded by an adhesive resistant to deterioration under climatic changes, exposure to water and freeze-thaw conditions consisting essentially of a mixture of about 80 to about 95 parts soybean flour having at least about 50% protein of which about 50% to 98% is water dispersible and about 97% is on the order of 200 mesh size granules, with about 5 to about 20 parts unmodified melamine formaldehyde resin."

The following references were relied upon by the examiner in rejecting the claims:

Meyercord 2,018,733 October 29, 1935
Sheeran 2,788,305 April 9, 1957
Delmonte, The Technology of Adhesives, pp. 53, 69–75 and 266–69 (1947).

The claims were rejected as unpatentable over Meyercord in view of Delmonte.

[1]. Serial No. 744,618 filed June 5, 1958 for "Insulation Board and Method of Producing the Same."

Meyercord is directed to the production of plywood, stating:

"Dried blood and casein glues and, more recently, soya bean flour glues have been commonly used to produce reasonably satisfactory glue joints between wood veneers. Glue joints made from resinous materials in the reactive or fusible state, especially of the thermosetting phenol-aldehyde type, are, however, of much greater strength and offer much greater resistance to deterioration. The cost of these resinous materials is high relative to that of the ordinary glues, thus sharply limiting the field of use of resin glues. The relatively high cost of the resinous materials has led to the mixing of suitable resins with various proteinous adhesives, such as casein and soya bean flour, as well as with heat-coagulable albumins, in order to produce an adhesive possessing some of the desirable properties of the resin glue, while costing less than would an adhesive consisting wholly of resinous materials."

Delmonte states that "Phenol-formaldehyde resins in conjunction with soybean as well as urea-formaldehyde resins have been described." Delmonte also indicates that dispersing soybean protein in aqueous formaldehyde solution should result in an adhesive having improved water resistance. Further with regard to the properties of melamine formaldehyde, Delmonte states, "While chemically resembling the urea resins, the melamine resins have definite advantages in their greater resistance to water, their better heat stability, and their ability to cure or set at lower temperatures * * *." Also, it is disclosed that melamine adhesives are capable of withstanding the three-hour boil test which only phenolics could previously withstand.

The examiner's position was that it would be obvious to substitute another resin of the thermosetting type, i. e., melamine formaldehyde disclosed by Delmonte for the phenol formaldehyde in Meyercord. The examiner noted that applicants had selected melamine formaldehyde for its weathering properties and pointed out that the moisture and temperature resistance of melamine formaldehyde were known as indicated by Delmonte. With regard to the specific proportions, the examiner felt that they were merely a matter of choice as evidenced by the fact that no unexpected results were attributable to them. The board affirmed the examiner.

We agree with the examiner and the board. Meyercord suggests adding thermosetting resins, especially phenolaldehyde, to soybean flour glue in gluing together wood plies. The purpose of the thermosetting resin is to add strength and resistance to deterioration. There is no indication that some thermosetting resins would not be compatible with soybean flour. Delmonte discloses melamine formaldehyde as a thermosetting resin having the desired heat and moisture resistance. The use of melamine formaldehyde as the thermosetting resin in the board disclosed in Meyercord would thus appear obvious within the meaning of 35 U.S.C. § 103. A further reason for holding the substitution obvious is the fact that Delmonte discloses combining urea-formaldehyde resins with soybean adhesive and also discloses that urea-formaldehyde is chemically similar to melamine formaldehyde, although the latter has better heat stability and moisture resistance. Because of the chemical similarity, there would be no reason to expect that melamine formaldehyde would not be compatible with soybean adhesive.

Appellants argue that the combination of Meyercord and Delmonte does not suggest their composition because there is no teaching that phenol formaldehyde resins and melamine formaldehyde are equivalent for all adhesive purposes. Thus, they argue that no one would know that melamine formaldehyde would be compatible with soybean flour adhesive. It is true that when the prior art does not describe the exact combination, there might always be some speculation that

the combination would possibly be ineffective. Appellants, however, have failed to cite one reason why doubt as to the efficacy of the combination of adhesives might exist in the mind of one skilled in the art. Appellants' position appears to be that success must be guaranteed before the combination can be considered obvious. However, in the absence of any fact which would deter one from making the combination of old adhesive suggested by the references, we find ourselves unable to accept appellants' argument.

Appellants' claims specify proportions of soybean flour and melamine formaldehyde and also are limited with regard to the composition of the soybean flour. The examiner held that selection of specific adhesives and combining them in the proportions desired was not patentably significant. Appellants' specification contains the results of tests run on boards having varying adhesive compositions. The resistance to moisture and temperature changes increased with increasing melamine formaldehyde content in an approximately linear manner. In view of Meyercord which suggests adding enough thermosetting resin to obtain the desired product, we agree that selection of desired ranges here by routine tests would be an obvious expedient, In re Aller, 220 F.2d 454, 42 CCPA 824. We also agree that there is nothing in the record to indicate that the specified solids and protein content of the soybean flour make the claimed invention unobvious. We note that appellants in their brief have not argued the significance of these limitations.

The board cited two cases, In re Berger, 143 F.2d 971, 31 CCPA 1234, and In re Swain, 156 F.2d 246, 33 CCPA 1266, in which we held compositions containing melamine formaldehyde unpatentable in view of prior art disclosing the use of phenol formaldehyde in the composition. We agree with appellants that in those cases the facts upon which the finding of unpatentability was based were different from the facts here. While the cases do not support a conclusion that the use of

melamine formaldehyde in place of phenol formaldehyde is obvious per se, we think they were properly cited by the board as pertinent to the issue here.

Because of the foregoing considerations, the decision of the Board of Appeals is affirmed.

Affirmed.

SMITH, Judge (dissenting).

Despite its spectacular advances, chemistry remains a most empirical science. By the process of experimental trial and error a new result is achieved. Applying hindsight evaluation, the majority finds that "selection of desired ranges here by routine tests would be an obvious expedient." I find nothing in the record to suggest that the claimed invention was the result of "routine tests." This characterization of appellants' efforts appears to have had its genesis in the examiner's mind. In the absence of any evidence to the contrary, I question seriously whether a) the selection of melamine formaldehyde resins from the thousands of resins available, b) the combination of it with a vegetable protein adhesive and c) the specific proportions here disclosed would have resulted from "routine tests."

What is there, other than a hindsight reconstruction of the prior art, to make appellants' invention obvious to one of ordinary skill in this art? I find nothing and am unwilling to eliminate from section 103 the requirement that obviousness must be determined as of the time the invention was made. As I understand it, this requires that we must evaluate the art as if appellants' suggestion had not been made. We must find in *that* art the teachings to a person of ordinary skill which would make the invention obvious to such person.

Here, it seems to me the invention resides in appellants' intelligent appreciation of the problem which faced the art prior to their work, their intelligent selection of particular materials to solve this problem having in mind in so doing both desirable and undesirable properties, and finally bringing together a particular

combination of such materials. I am willing to concede that once appellants have taught the art what the problem was and have disclosed their selection and combination of materials to solve the problem—that *at this point,* but *not until this point*—the invention may become a matter of "routine testing." But one simply does not go into a chemical laboratory and begin a hit and miss mixing of this with that as a routine exercise. The majority here has failed to separate the intellectual aspects of the invention in issue from a particular embodiment of these aspects. Thus it reduces the concept of the "subject matter as a whole" of section 103 to nothing more than a matter of "routine" testing, whatever this may mean.

From the art here, it was appellants, and appellants only, who perceived the problem to be solved and who suggested a new and unobvious combination of known materials for their specific chemical and physical properties. I would, therefore, reverse the decision below.