54 CCPA

**Application of Jimmie L. HUITT and Bruce B. McGlothlin.**

**Patent Appeal No. 7730.**

United States Court of Customs and Patent Appeals.

April 13, 1967.

Rehearing Denied June 22, 1967.

Smith and Rich, JJ., dissented.

Paul L. Tillson, Pittsburgh, Pa. (Meyer Neishloss, Pittsburgh, Pa., of counsel), for appellants.

Joseph Schimmel, Washington, D. C. (L. F. Parker, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.[*]

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the prior art rejections of claims 1, 3, 4, 6, 13, 15, 23, and 24 of appellants' application serial No. 106,473, filed May 1, 1961, for "Improvements in Method of Fracturing Underground Formations and Propping Agent Therefor." No claim has been allowed.

Appellants' invention relates to a method of hydraulically fracturing subsurface formations penetrated by well bores to increase the production of fluids therefrom and to a propping agent to be placed in the fracture to hold it open. Such methods are designed to improve production from the well by either creating new flow channels or enlarging existing ones. To accomplish hydraulic breakdown of the producing sections, a thickened fluid having a propping agent consisting of finely divided particles of material suspended therein is injected into the well bore under pressure high enough to overcome the tensile strength of the formation to be fractured. After fracturing occurs, the propping agent carried by the fluid is deposited in the fracture to hold it open. Propping agents such as sand or ground nutshells have been used in this art prior to appellants' invention.

In the invention here claimed, the propping agent used is ground nutshells or granular hard plant seeds such as peach seeds, the particular novelty asserted being in the selection of such materials to provide a particle size in the range of 4 to 40 mesh screen and having

[*] Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

an average Krumbein roundness and sphericity in the range of 0.8 to 0.9.

Appellants' specification defines the terms "Krumbein roundness and sphericity" as follows:

The term "sphericity" \* \* \* is equal to the ratio of the nominal diameter of a particle to the maximum intercept of the particle. The nominal diameter of the particle is the diameter of a sphere having the same volume as the particle. The maximum intercept of the particle is the diameter of a sphere circumscribing the particle. The roundness of a particle is the ratio of the average radius of corners and edges of the particle to the radius of the maximum inscribed circle. \* \* \*

It is immediately apparent from inspection of the above definitions that the maximum roundness and sphericity value of 1.0 is attained when the particle has the shape of a perfect sphere.

Claims 1, 3, 4, 6 and 23 are drawn to appellants' propping agent and claims 13, 15, and 24 are directed to a method of fracturing a subterranean formation and propping the fracture open using the propping agent. Claims 1 and 13 are illustrative and read as follows:

1. An agent for propping open a fracture in a subsurface formation comprising particles of a hard material selected from the group consisting of nutshells and seeds of fruits, said material having a high compressive strength and the character of deform-

ing without shattering when subjected to compressive load, said particles having an average sphericity and roundness between 0.8 and 0.9 and a size such that said particles pass a No. 4 screen and are retained on a No. 40 screen of the U. S. Sieve Series.

13. A method of fracturing a subterranean formation and propping the fracture open to increase the flow of fluids into a well penetrating said formation comprising pumping a liquid containing a fluid loss reducing additive down the well and applying pressure to said liquid adequate to create a fracture extending from the well into the formation, displacing a liquid containing a fluid loss reducing additive and 0.2 to 0.5 pound of propping agent per gallon of liquid into the fracture adapted to deposit said propping agent in a partial monolayer in said fracture, said propping agent comprising a hard material selected from the group consisting of nutshells and seeds of fruits, said materials having a high compressive strength and the character of deforming without shattering when subjected to compressive load, the particles of said propping agent having a size in the range of 4 to 40 mesh and being further characterized by an average Krumbein roundness and sphericity in the range of about 0.8 to 0.9, and thereafter releasing the pressure on the well.

The references relied upon to support the rejections are:

| Clark et al. (Clark) | 2,838,116 | June 10, 1958 |
| Scott et al. (Scott) | 2,943,680 | July 5, 1960 |
| McGuire et al. (McGuire) | 2,950,247 | August 23, 1960 |
| Morse | 2,962,095 | November 29, 1960 |

The examiner rejected product claims 1, 3, 4, 6, and 23 as unpatentable over Scott and all appealed claims as unpatentable over Morse in view of Clark with further reference to McGuire under 35 U.S.C. § 103. We do not find it necessary to consider the former ground of rejection since we hold that the latter ground is worthy of affirmance.

Morse teaches the general principle that fractures formed and extended by hydraulic methods "are normally filled or held open by depositing therein a solid granular medium which has a substantial compressive strength and is highly permeable to fluid flow." With regard to the materials, sizes, and shapes of his propping agents, Morse discloses:

> As examples of such organic materials may be mentioned *ground hard fruit stones, nutshells* * * * preferably formed or ground to approximately uniform sizes * * * *a screen size between about 8 and about 40-mesh being preferred.* The more nearly uniform in size the particles are within this range the greater is the permeability of the fracture that is filled with them. It is *also highly desirable that the shape* of the particles *be rounded* so as to be cylindrical or *spherical,* and when manufactured particles are employed such shapes can be easily provided. [Emphasis ours.]

Thus, Morse teaches the use of the same materials employed by appellants as propping agents, and a "preferred" size range of 8 to 40 mesh, which is only slightly narrower than appellants' claimed range of 4 to 40 mesh, with the same preferred upper limit on particle size. Although Morse does not teach in terms of numerical values for roundness and sphericity, it is clear from the definitions quoted above from appellants' specification that the "spherical" particles said to be "highly desirable" possess the maximum Krumbein roundness and sphericity of 1.0. Appellants acknowledge in their brief that "the effective

teaching of Morse is that spherical propping agents; that is, propping agents having a roundness and sphericity of 1.0 are preferred."

McGuire teaches the use as propping agents of large particle size materials of "generally spherical" shape. Such particles, like those of Morse, would have a roundness and sphericity of 1.0. McGuire also discloses the preferred practice of depositing the propping agent particles in the fracture as a monolayer. The patent also speaks of the disadvantages inherent in the use of sand as a propping agent and the desirability of using other materials of appropriate size and "generally spherical" shape and having higher compressive strength than sand.

Clark discloses the use of a propping agent, typically sand, in the amount of 0.5 to 10 pounds per gallon of fracturing liquid. With regard to the shape of his propping agent particles, Clark states:

> A *well rounded* sand, typically a sand having a *Krumbein roundness of at least 0.7, is preferred. Roundness in this range* or lack of angularity appears to decrease the tendency to bridging of the sand or "sanding out" in the fracture whereby the sand is filtered out of the fracturing liquid and deposited in or adjacent to the well. The size of propping agent also is important * * *. [Emphasis ours.]

Since no upper limit is expressly stated for "this range" which is "preferred" by Clark, the range could be interpreted as either a definite or indefinite one. If the range is considered in its broadest, but definite sense, it extends from the lower limit of 0.7 to the maximum upper limit of 1.0, the Krumbein roundness and sphericity of a perfect sphere, particles of which shape are preferred by Morse and McGuire. In that event, appellants' claimed range of 0.8 to 0.9 embraces the only two values in the preferred definite range which are not clearly anticipated by the prior art, which dis-

closes the two extremes of this narrow range, i. e. particles "having a Krumbein roundness of at least 0.7" (Clark) and "spherical" (Morse) or "generally spherical" (McGuire) particles, which by definition possess roundness and sphericity of 1.0.

Alternatively, "this range" which Clark discloses to be "preferred" may be interpreted in a narrower, indefinite manner to include 0.7, certainly the next adjacent higher value, 0.8, and possibly the next higher value, 0.9, which the Solicitor in his brief asserts to be "the next value after 0.7 on the Krumbein visual indicator scale."

We think Clark's disclosure that "Krumbein roundness of at least 0.7, is preferred" would clearly suggest to any person skilled in the art that a Krumbein roundness slightly greater than 0.7 would be even more preferred than 0.7 itself. The next two values greater than 0.7 are both embraced by appellants' claimed range of 0.8 to 0.9.

The Huitt affidavit of record shows that those skilled in the art know that sand having a roundness as low as 0.5 can be used as a propping agent. However, it is generally true that a preferred range is narrower in scope than the broadest operable range, and the fact that the operable roundness range for sand is 0.5 to 1.0 does not in any way detract from Clark's effective teaching that "this range" which he "preferred" is either 0.7 to the maximum value of 1.0 or 0.7 to slightly greater than 0.7, e. g. 0.8 or 0.9. Regardless of whether Clark's preferred range is interpreted to have the definite upper limit of 1.0 or an indefinite upper limit such as 0.9, we agree with the examiner's position, also quoted with approval by the board, that:

> * * * to select a particular roundness and sphericity range within this [narrow] range suggested by the prior art which produces optimum results would be within the purview of one skilled in the art, and to so use par-

ticles having such a roundness and sphericity would not patentably distinguish over the art under 35 USC 103. * * *

In their brief appellants acknowledge the "suggestion by Clark et al of using sand having a roundness higher than 0.7 resulting from the use of the term 'at least 0.7,' " but urge that the affidavits of record "show extensive research over several years before the appellants made their invention, commercial success, and acknowledgment by the industry of appellants' contribution." We have considered appellants' proofs of these relevant "secondary considerations," Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, but under the particular circumstances of this case these factors do not persuade us that the claimed subject matter is nonobvious under 35 U.S.C. § 103, just as the Supreme Court was not persuaded by proof of similar factors in a companion case heard and decided concurrently with Graham, namely Calmar Inc. v. Cook Chemical Co., 383 U.S. at 35–36, 86 S.Ct. 684. We think it is also worthy of mention here that three of the four prior art patents relied on by the Patent Office issued in the latter half of 1960, less than one year before appellants' filing date of May 1, 1961. Thus, we are not faced with a situation where the information disclosed by these patents was made available to the public long prior to the date of appellants' invention. See Calmar, Inc. v. Cook Chemical Co., supra.

In summary, we are in full accord with the following analysis by the examiner of the fact situation in this case:

> * * * the Morse and Clark et al references definitely point the way to the use of rounded and spherical shaped nutshell propping agents and broadly suggest a [narrow] range with respect to roundness and sphericity of .7 to 1.0 which encompasses the presently claimed range. It is the Examiner's position that the use of particles having a roundness and sphericity

within this range (e. g. .8–.9) which represents the best compromise between reduced tendency to screen out on the one hand and good fluid flow capacity on the other would be well within the purview of one skilled in the art with the teachings in the references before him.

It is frequently true, in general life as well as in the field of invention, that optimum results are achieved by pursuing the path of moderation and avoiding the extremes of suggested ranges. This is precisely the case here, where appellants have discovered that "the best compromise" lies at the midpoint, 0.8 to 0.9, of the relatively narrow range, 0.7 to 1.0, which is clearly suggested by the prior art. We consider this discovery to be one which, "as a whole," is obvious under 35 U.S.C. § 103. Therefore, the decision of the board is affirmed.

Affirmed.

SMITH, Judge (dissenting), with whom RICH, J., joins.

My disagreement with the majority arises from a difference in point of view as to what the prior art taught one of ordinary skill in the art prior to appellants' invention. 35 U.S.C. § 103 requires a consideration of facts upon which the ultimate legal conclusion of obviousness is based. Considering the claimed subject matter in view of the facts of record, I find the board's conclusion of obviousness to be unsupported by the necessary facts, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

Simply stated, appellants' invention is a propping agent and a method for propping subsurface fractures formed by hydraulically fracturing a subsurface formation as in oil bearing strata. The purpose of the invention is to increase the production of fluids from wells drilled into such formations. To prevent closure of the fractures upon release of the frac-

turing pressures, propping agents have been placed in such fractures. When a subsurface formation is correctly fractured and propped open, production from the well, either by creating new flow channels or enlarging existing flow channels, is improved. This is a highly developed technical art in which hydraulic breakdown of producing subsurface sections is accomplished by the use of a thickened fluid having the propping agent therein. The propping agent consists of finely divided particles of material suspended in the fluid and injected with the fluid into the well bore under pressures high enough to fracture the adjoining subsurface formations. After fracturing occurs, and upon release of the fracturing pressure on the fluid, the propping agent remains in the fracture and holds it open. Prior to appellants' invention, propping agents such as sand or ground nutshells have been so used.

There were technical problems in using the prior art propping agents. These problems were met and overcome by the invention here claimed and in which the propping agent used is ground nutshells or the granular shells of hard shelled plant seeds such as peach stones. The particular novelty here asserted lies in the selection of such materials to provide a particle size in the range of 4 to 40 mesh screen and having a Krumbein roundness and sphericity in the range of 0.8 to 0.9. I respectfully differ from the majority in finding that either an understanding of the problem in the art or the provision of the particular size, range and shape of propping agents was obvious under the conditions specified in 35 U.S.C. § 103.

To understand the basis for this dissent, it is necessary to consider in more detail than has the majority 1) the precise nature of appellants' invention and 2) the prior art teachings.

*The Nature of Appellants' Invention*

Appellants' invention has its genesis in an understanding of the problems

created by the technical shortcomings of the prior art. In their specification they discuss the prior art use of sand and other propping agents and they also describe their invention in relation thereto as follows:

Sand has several shortcomings as a propping agent. In addition to the screening out mentioned above, the sand particles will not deform when subjected to the weight of the overburden after the pressure on the fracturing fluid is released. If the formation fracture is soft, the sand particles become embedded in the formation thereby allowing the fracture to close partially and causing a reduction in the fluid carrying capacity of the fracture. If the formation is hard, the sand particles are crushed by the weight of the overburden into very fine particles which have little effect in holding the fracture open and plug openings between larger particles to produce a fracture of low permeability.

Propping agents of crushed woody materials, such as walnut shells, have been used to avoid some of the difficulties encountered with sand. The woody materials are deformed slightly by the application of pressure and do not embed as deeply in soft formations as sand particles. Moreover, the woody materials, when subjected to high pressures, tend to be squashed into a pancake rather than break into fine particles which are removed from the fracture by the fluids produced from the fractured formation. However, crushed nut shells ordinarily cause more difficulty with screening out than sand.

We have discovered that hard, woody particles, such as crushed nut shells of suitable size having a very narrow range of sphericity and roundness, as those terms are hereinafter defined, are particularly effective materials for propping fractures in that screening out of the propping agent is avoided and fractures of high fluid flow ca-

pacity are obtained. It is an important characteristic of the novel propping agents of this invention that they have an average sphericity and roundness of at least 0.8. We have further discovered that increase in sphericity and roundness above about 0.9 cause a surprising and rapid reduction in the fluid flow capacity of the fractures propped with such woody particles of extremely high sphericity and roundness. The novel propping materials of this invention have an average sphericity and roundness in the range from 0.8 to about 0.9.

The terms "sphericity" and "roundness" appear in the claims and are carefully defined in appellants' specification by reference to the publication "Stratigraphy and Sedimentation" by Krumbein and Sloss, pages 78 through 83, published by W. H. Freeman Company, 1951 Edition.

Thus we find the term "sphericity" is defined as being "equal to the ratio of the nominal diameter of a particle to the maximum intercept of the particle." The nominal diameter of the particle so referred to is defined as "the diameter of a sphere having the same volume as the particle." The "maximum intercept" of the particle is defined as "the diameter of a sphere circumscribing the particle." The roundness of a particle is "the ratio of the average radius of corners and edges of the particle to the radius of the maximum inscribed circle."

*The Prior Art and Section 103*

The disclosures of the prior art, when considered in relation to appellants' invention as a whole, do not support the rejection under the conditions specified in 35 U.S.C. § 103. Morse discloses processes of oil recovery which utilize combustion within the reservoir for generating heat and assisting in the recovery of oil. By any standard, the teachings of Morse require a very different type of propping agent from that disclosed

and claimed by appellants. According to Morse:

> * * * During fracturing there is introduced into the fractures and deposited therein a material to maintain the fractures open and permeable until the arrival of a combustion zone, when the material will then be affected by the combustion or its associated temperature rise to reduce the fracture permeability substantially or to seal it completely. *This material is preferably a rigid, granular solid capable of acting as a support or prop to hold the fracture open, but susceptible to being altered, softened, or consumed by the combustion or the heat thereof to have its compressive strength or supporting ability destroyed so that the fracture closes itself or becomes sealed by the softening and flow of the introduced material.*

> * * * Ahead of the propagating combustion zone in the direction of its propagation, the flow of fluids is primarily along the fractures, while *behind the combustion zone or after it has passed, the fractures are substantially sealed and the flow of fluids is through the burned-out formation.* [Emphasis added.]

Morse discloses nutshells as propping agents stating:

> * * * These are preferably formed or ground to approximately uniform sizes which are neither very large nor very small, a size corresponding to a screen size between about 8 and about 40-mesh being preferred. The more nearly uniform in size the particles are within this range the greater is the permeability of the fracture that is filled with them. It is also highly desirable that the shape of the particles be rounded so as to be cylindrical or spherical, and when manufactured particles are employed such shapes can be easily provided.

The parties appear to agree that Morse teaches propping agents having a roundness and sphericity of 1.0 are preferred.

Additionally, appellants submitted the affidavit of patentee Morse wherein he explains:

> The reference * * * to particles of cylindrical or spherical shape was to manufactured particles such as those made of plastics or metal which could readily be made in desired shapes to produce a multilayer pack of substantial permeability. In making such reference, the criterion was only the ease of manufacture and no consideration was given to whether or not the particles could be readily displaced into the fracture.

It thus seems Morse considered propping agents having a roundness and sphericity of 1.0 would yield higher permeability in fractures. While the solicitor argues Morse's remarks in the affidavit are "irrelevant" and "self-serving," I do not find anything in the above remarks inconsistent with either the Morse specification or any argument advanced by the solicitor as to the merits of the rejection. Where an affidavit does not controvert the teachings of the prior art relied on by the Patent Office, its position is not diminished in absence of a challenge of some sort to the affidavit.

Clark discloses processes for fracturing formations to increase fluid productivity employing fracturing fluids and propping agents. According to Clark:

> A well rounded sand, typically a sand having a Krumbein roundness of at least 0.7, is preferred. Roundness in this range or lack of angularity appears to decrease the tendency to bridging of the sand or "sanding out" in the fracture whereby the sand is filtered out of the fracturing liquid and deposited in or adjacent to the well. The size of propping agent also is important, particularly with regard to the size of the bridging material. * * * props having a wide particle size range will not support as much load without crushing as substantially uniform particles. Accordingly, the propping agent preferably has a parti-

cle size distribution of less than about 40 mesh units, typically less than about 20 mesh units. * * *

McGuire discloses large-size propping agents. According to McGuire, the propping agents are,

* * * manufactured, formable materials selected from the group consisting of metallic, ceramic, and plastic particles of generally spherical shape having a diameter in excess of 0.03 inch, and preferably in excess of 0.08 inch, and which are capable of supporting a load above 40 pounds per particle, and preferably above 100 pounds per particle, without fragmentation.

McGuire further discloses:

The advantages of employing the large size propping agents contemplated by the present invention may be illustrated by a comparison of the permeabilities which can be obtained when propping agents of conventional size are employed with the permeabilities which can be obtained by the use of the propping agents of the present invention. * * *

Further facts of record are as follows: An affidavit by Huitt was offered to show that those skilled in the art knew that sand having a roundness as low as 0.5 can be used without difficulty concerning screening out. The Huitt affidavit also is alleged to set forth facts demonstrating the commercial success of the invention.

Additionally, in appellants' specification test data is set forth which allegedly proves that the phenomena of screen out is directly dependent upon sphericity and roundness. Thus screen out is decreased by increasing sphericity and roundness. Further test data allegedly proves that flow capacity of a propped fracture is indirectly dependent upon sphericity and roundness. Thus flow through a propped fracture decreases as sphericity and roundness are increased. No challenge has been made as to the accuracy of these factual demonstrations.

Appellants' factual demonstrations appear to be reasonable assertions of fact which have not been challenged and I accept them as such. Thus, I find the present record supports appellants' position that they have discovered there is an optimum range of sphericity and roundness in the particles of the propping agent which controls the tendency towards screening out without unduly decreasing the flow capacity of the fractures. Their discovery resides in their finding that this optimum range for sphericity and roundness is 0.8 to 0.9, and this is the only range claimed in the appealed claims. The Patent Office position is that the selection of this range is obvious from the prior art of record. The board stated:

* * * We accept, as our own, the Examiner's position which is stated as follows:

" * * * to select a particular roundness and sphericity range within this range suggested by the prior art which produced optimum results would be within the purview of one skilled in the art, and to so use particles having such a roundness and sphericity would not patentably distinguish over the art under 35 USC 103."

As stated in In re Aller et al., 42 CCPA 824 * * * 220 F. (2d) 454; 105 USPQ 233, "where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." Moreover, the lower limit of 0.8 with respect to the roundness and sphericity is amply suggested from the teaching of the references.

It seems to me the board's position rests on an exaggerated view of the reference teachings which it finds to be favorable to its position. Clark states as to sand "a Krumbein roundness of at least 0.7 is preferred." Morse states nutshells should be "rounded so as to be

cylindrical or spherical." McGuire states large-sized manufactured propping agents should be "generally spherical." *Nothing more is said in the above references concerning particle shape.* The majority would have us believe that Clark suggests a lower limit while Morse and McGuire suggest an upper limit and it would be well within the ordinary skill of the art to ascertain the optimum range.

This reasoning begs the question. Discovering the point or range of criticality may be very simple *after* someone had first discovered that such a critical relationship exists. As I view it, it is this first discovery that appellants have attempted to claim.

The board relied on *In re Aller,* supra, which in fact is contrary to the board's conclusion. Therein the applicant had taken a prior art process and lowered the operating temperatures and increased the sulphuric acid concentrations. This new process allegedly resulted in increased yields and shortened reaction times. The Patent Office introduced *facts* demonstrating that the manipulation of temperature and acid concentrations as the applicant had done would be expected to result in increased yields and shortened reaction times. The court found the applicant's evidence insufficient to demonstrate that the claimed results were unexpected. The opinion points out, 220 F.2d 454, at 457, 42 CCPA at 828, 830:

> * * * Appellants have not shown anything "critical" about their process, unless lower temperatures and higher acidity generally are critical.
>
> *  *  *  *  *  *
>
> * * * If it could be held that the skilled chemist would never think to reduce the temperature or increase the acid concentration, then it might be held that [patentable] invention resides in so doing.

Here, as distinguished from the situation in the *Aller* case, the Patent Office does not challenge appellants' proof that screen out is diminished and flow capacity is decreased as roundness and sphericity are increased. There is no evidence that these results would be expected or suggested by the prior art. Nothing in the prior art would suggest to one of ordinary skill that an optimum range of roundness and sphericity existed. There exists a hiatus between proof that the prior art preferred rounded particles as propping agents and proof that the optimum range claimed existed in establishing obviousness under section 103.

I therefore find appellants' discovery to be unobvious in view of Clark, Morse and McGuire. Accordingly, the board's decision as to these claims should be reversed.

### Claims 1, 3, 4, 6 and 23

These claims were rejected as being "unpatentable over" Scott who discloses that certain plant seeds can be used to "bridge and seal natural or artificially created fractures to prevent excessive loss of the liquids from the wells." Scott discloses "substantially all the additive particles should pass a number 4 screen and be retained on a number 100 screen." The specification also states:

> A large proportion of crevices in formations penetrated by wells can be bridged by particles in the range from 10 to 40 mesh; therefore, it may be desirable to employ an additive containing as much as about 90 percent of particles in this range, the only other particles being about 10 percent of fines in the 40- to 100-mesh range. Preferably, however, a larger percentage of particles in the 40- to 100-mesh range, for example 20 percent to 25 percent, should be used, reducing the concentration of from 10- to 40-mesh material to about 75 or 80 percent. * *

As to shape, Scott states the particles "should have an average sphericity factor [Krumbein] of at least about 0.4 and an average roundness factor [Krumbein] of not more than about 0.6."

Up to this point it is clear that appellants and Scott are concerned with different objectives. Scott desired to seal fractures while appellants desire to avoid

screening out and achieve high permeability in the fracture. Both propose the use of nutshells within substantially the same screen size.

However, to demonstrate sealing and the importance of angularity, Scott discloses test data wherein the sealing ability of different shaped black walnut shells is demonstrated. Two samples were prepared, each containing 75% of the 4 to 40 screen size particles and 25% of the 40 to 100 screen size particles. The "angular particles" of Scott's *invention* "had a Krumbein sphericity of about 0.7, and a Krumbein roundness of about 0.2. For the rounded particles, the comparable figures were 0.8 and 0.8, respectively." The angular particles withstood a pressure of 2300 p. s. i. while the rounded particles withstood 0 pressure. It is Scott's disclosure of *rounded particles* as described above that the Patent Office relies on as apparently anticipating the invention, 35 U.S.C. § 102(a).

The board reasoned as follows:

* * * We fully agree with the Examiner that, due to the term "comprising," the claims do not exclude the 40 to 100 mesh particles of the composition shown in Example 5, column 10 of the Scott et al. patent. * * *

We will not, however, sustain the rejection of claim 23 as unpatentable over Scott et al. Claim 23, because of the use of the term "consisting," excludes the 40 to 100 mesh particles of Scott et al. Thus not only is the claimed composition new * * * but the McGlothlin affidavit clearly demonstrates that it produces unexpected results.

Appellants argue as follows:

It is submitted that the proper interpretation of claims 1, 3, 4, and 6 is that they are open to the inclusion of materials *other than* the certain hard, deformable materials, but that *all* particles of the certain hard, deformable materials *must* pass a No. 4 screen and be retained on a No. 40 screen, and the particles must have an average round-ness and sphericity of between 0.8 and 0.9. * * * [Emphasis added.]

* * * * * *

* * * the 40 to 100 mesh particles of Scott et al are smaller particles that would pass through a 40 mesh screen, hence the Scott et al composition is excluded.

There is a reason for defining the appellants' invention in the manner of claims 1, 3, 4, and 6. Propping agents are frequently used with spacer materials that are soluble in formation fluids to aid in the spacing of the propping agents throughout the fracture. During production from the well, the spacer particles are dissolved to leave larger openings between the propping agent particles within the fracture. To require the appellants to define their invention in the manner used in claim 23 would invite unauthorized use of the appellants' novel propping agents. It has long been recognized that no particular form of claim is required if the meaning of the claim is clear. *Brown v. Guild*, 90 U.S. 181. * * * By reversing the Examiner's rejection of claim 23 as unpatentable over the Scott et al patent, the Board of Appeals has also recognized the failure of the Scott et al patent to suggest the appellants' invention * * *. Hence, the only issue pertinent to the rejection of claims 1, 3, 4, and 6 on Scott et al is whether those claims exclude the Scott et al composition. * *

It is apparent that the board was of the view that "consisting" always excludes and "comprising" always allows the inclusion of other substances in a claim. Appellants' claims therefore were found to "read on" the disclosure in Scott and were thus anticipated, 35 U.S.C. § 102(a). Appellants, in substance, argue that under technical claim construction "comprising" may sometimes include *and* exclude. Further, the nature of their invention requires the claim form used and as Scott fails to suggest their invention, the issue is whether the claims exclude the Scott composition.

It seems to me the proper course is not to add further technicalities to the now complex task of interpreting claims. In view of appellants' explanations, I find no objection in view of Scott as to the manner in which appellants' invention is defined. See In re Bridgeford, 357 F.2d 679, 53 CCPA ——. More importantly, Scott is clearly *not an enabling disclosure of appellants' invention.* In re Brown, 329 F.2d 1006, 51 CCPA 1254. The Scott disclosure does not *describe* or render appellants' invention obvious. 35 U.S.C. §§ 102(a), 103. Scott *teaches* what Clark stated, i. e., "bridging agents" are "typically * * * more angular" than propping agents and propping agents yield greater permeability and less resistance to pressure.

The decisions of the majority and the board rest on a factual basis for which I do not find support in this record. I would reverse the decision of the board.