**BIRD PROVISION COMPANY**

v.

**OWENS COUNTRY SAUSAGE, INC.**

**BIRD PROVISION COMPANY**

v.

**Clifford B. OWENS and Jerry P. Owens.**

**Nos. CA 3–2149, CA 3–2480.**

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 6, 1974.

---

Allen Butler, Clark, West, Keller, Sanders & Butler, Dallas, Tex., and Harvey B. Jacobson, Jr., O'Brien & Jacobson, Washington, D. C., for plaintiff.

Carlisle Blalock, Tobolowsky, Schlinger & Blalock, Merrill L. Hartman, Hewett, Johnson, Swanson & Barbee, Richards, Harris & Hubbard, Dallas, Tex., Mason, Fenwick & Lawrence, Washington, D. C., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

What in the ancient art of making fresh pork sausage is truly new—patentably new?

That deceptively simple question is at the heart of this hard-fought lawsuit charging the infringement of U.S. Patent 3,124,462, owned by the plaintiff Bird Provision Company. The patent covers a method of processing and packaging sausage in an air impermeable container (made of Saran film) within three and one-half hours after the hog is slaughtered and while the meat temperature remains above 80° F.[1]

The defendants, Owens Country Sausage, Inc. (in CA 3–2149–C), and two of its officers, Clifford B. Owens and Jerry P. Owens (in CA 3–2480–C), admit that they infringed the patent, but challenge its validity on several grounds.

Having tried the consolidated cases and having reviewed all the evidence, pleadings, and arguments, the Court agrees with the defendants that the pat-

1. All temperatures are expressed in degrees Fahrenheit unless otherwise specified.

ent is invalid and unenforceable. Bird will be denied the injunctive relief and money damages it sought, and Owens will be granted the declaratory judgment prayed for in its counterclaim.

To understand the nature of this dispute, the reader must have at least an elementary knowledge of the history of sausage-making and the process used in making fresh (as opposed to cured) pork sausage. Homer's *Odyssey*, written about the ninth century B.C. contains the first authenticated reference to sausage, according to one account.[2] In addition, the ancient Romans are believed to have mixed fresh ground pork with spices to make sausage.[3]

The first step in sausage making is, obviously, slaughtering (or "bleeding") the hog. Next the carcass is dressed; this is the removal of head and entrails. After that, the meat is boned; in other words, the meat is sliced away from the bones. The meat then is ground, and seasoning is mixed in. Finally, the uncooked sausage is stuffed, or packaged. Packaged sausage is refrigerated to prevent spoilage by bacterial action.

In what Bird describes as the "conventional" method of sausage making in the United States, the hog carcass is chilled overnight in a 35–40° cooler and all further processing is done while the meat is cold. In the patented process in this suit, by contrast, the meat is not chilled but rather is processed immediately after slaughter, while still warm and "fluent". This means it is closer to a liquid than a solid; it will not, for example, hold its shape if formed into patties.

For years, sausage destined for retail sale was stuffed into cloth bags. Later, cellophane and polyethylene were used as the container material. Finally, Bird began using tubes of Saran, a pliable film technically described as vinylidene chloride copolymer. While cloth, cello-

phane and polyethylene all allow varying quantities of oxygen to penetrate them, Saran is highly resistant to the passage of oxygen and other gases.

Bird claims that its patented combination of hot processing and Saran packaging dramatically increases the length of time pork sausage will keep on grocery store shelves and in consumers' homes without spoiling, discoloring or losing its flavor. In fact, Bird says sausage made according to its patent will stay fresh six weeks in a fresh meat case, and at least two years when frozen. This extended shelf life has obvious commercial advantages over earlier methods of processing pork sausage, which is among the most perishable of meat products.

At trial and in briefs, Owens set forth several reasons that it believes the patent is invalid: (1) fraud on the U.S. Patent Office in Bird's obtaining the patent, (2) prior public uses and sales, (3) obviousness in view of prior art references, and (4) vagueness and indefiniteness. The Court is of the opinion that the patented process was in prior public use and was obvious, making a discussion of the other allegations unnecessary. The reasons for these conclusions now will be discussed in some detail.

## I. PRIOR PUBLIC USE AND SALES

Owens[4] has asserted the defense of prior use, as permitted by Congress in 35 U.S.C. § 102(b). The statute provides, in part, that a patent shall not issue if

> the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

The application for the patent in suit was filed on August 10, 1960. Thus the patent was improperly issued if the Bird

---

2. 20 Encyclopaedia Britannica *Sausage* (1962).

3. *Meat*, March 1957, p. 92, cited in Owens' pretrial brief at 3.

4. "Owens" will be used throughout to refer to Owens Country Sausage, Inc.

process was in public use in the United States before August 10, 1959. Evidence at the trial showed that the Bird process was indeed in prior public use.

First, and probably of less importance, on-the-farm hot sausage processing dates back to the early days of the United States.. Owens' production manager, R. A. Loftus, testified that when he was a boy growing up on a farm he had seen his father make sausage by slaughtering a hog in the wintertime, skinning and boning it without refrigeration, grinding, mixing, and finally stuffing the sausage into either a cloth bag or a glass jar that was sealed by pouring grease over the meat and allowing it to harden. In fact, in preparation for the trial of this case, Mr. Loftus duplicated the farm method at the Owens plant, ensuring that the processing was completed within three and one-half hours of slaughter while the meat temperature remained above 80°. After about nine months of storage, he cooked and ate some of the test sausage. He and another witness who ate some of it, Robert Langford, Owens' manager of engineering maintenance, described the flavor as good, although not outstanding. Mr. Langford also testified about observing straight-through sausage processing when he was growing up on a Texas farm. In fact, I can remember that I saw on-the-farm sausage making in my own youth. Farmers, obviously, did not package their sausage in Saran, but Owens' expert witness testified that the glass-and-lard combination formed an air impermeable barrier equivalent to Saran packaging. Alternatively, a paraffin-coated cloth bag would form an air impermeable container, according to the witness, Dr. Robert Saffel. Bird's expert, Dr. John Silliker, in response to a hypothetical question on cross-examination, testified that assuming the lard did in fact have an air impermeability equivalent to Saran, if pork sausage were poured into a stone crock within three and one-half hours from the time of slaughter while the temperature remained above 80°, and lard were poured on top of the sausage, this farm process would fall within the teachings of the Bird patent.

Secondly, Owens maintained at trial that the Bird process was in prior use at the R. B. Rice Sausage Co. in Lee's Summit, Missouri, prior to August 10, 1959. Witnesses, depositions and documentary evidence were presented to support Owens' contention. For example, Harold B. Rice, president of the Rice Company, told in his deposition of packaging hot processed sausage in Saran as early as 1952 or 1953 and selling some of it to retailers. Although Mr. Rice did not consider time and temperature of the meat critical, it appears from his testimony that at least some of the Saran-packaged Rice sausage was processed within the time and temperature limits of the Bird patent and was sold at retail. Corroboration of this conclusion comes from other testimony, such as that of the deponents Harold Orlich and Donald Zeller. Both men were employed by Kartridg Pak Machine Co., a manufacturer of meat packaging machinery, and both visited the Rice plant in connection with Mr. Rice's use of Kartridg Pak equipment to package sausage in Saran. Mr. Orlich saw "warm and soupy" sausage packaged in Saran on a Kartridg Pak machine he had installed.

Although, as noted above, Mr. Rice testified that some Saran-packaged sausage was sold at retail, he characterized the Saran packaging as experimental, or for test purposes. Bird seizes upon this as evidence that the sales fall outside the provisions of the prior use statute cited above. As a general proposition, it is true that "[i]f the purpose of the prior use is mainly experimental, it will not negative novelty." 1 Deller's Walker on Patents, § 59, p. 259. This rule, however, applies to experiments *by the inventor,* as was the situation in the cases cited by Bird, Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878) and Hunt Industries, Inc. v. Fibra Boats, Inc., 299 F.Supp. 1145 (S.D.Fla.1969). However, "[t]he use or sale by third parties of what con-

stitutes the claimed invention is not an experimental use within the exception." Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 267 F. Supp. 726, 785 (S.D.Cal.1966), modified on other grounds and aff'd., 407 F.2d 288 (9th Cir. 1969). *See also* Bourne v. Jones, 114 F.Supp. 413 (S.D.Fla.1951), aff'd, 207 F.2d 173 (5th Cir. 1953), cert. denied 346 U.S. 897, 74 S.Ct. 220, 98 L. Ed. 398 (1953); Magnetics, Inc. v. Arnold Engineering Co., 438 F.2d 72, 74 (7th Cir. 1971)

■ Thus, even if Mr. Rice's use of Saran packaging of sausage processed within the time and temperature limits of the Bird patent is characterized as merely experimental, it nevertheless invalidates the patent under 35 U.S.C. § 102(b).

Thirdly, it is Owens' contention that another public use occurred at the Keith Brothers Sausage Co. in Salem, Virginia. A document and the testimony of a witness and a deponent are relied on to support this claim.

The document is a log book of Tee-Pak, Inc., a manufacturer of artificial casings for the meat industry. According to its originator, Lawrence A. H. Peterson, Tee-Pak sales service supervisor, the log book indicates that the firm received in 1955 an order to print a three-color design on Saran packaging for Valley Dale Packers in Salem, Va. (A similar order came in the same year from the Rice firm in Lee's Summit, Mo.)

The witness and the deponent, Don H. Walker and Ray C. Mollett, respectively, both testified that Valley Dale bought Keith Sausage Co. or Keith Brothers Sausage Co. Mr. Walker, the sausage foreman for Keith from 1952 to 1956, agreed with Mr. Mollett that Keith's sausage bags were ordered through Valley Dale. Both men told of seeing hot processed pork sausage packaged in Saran at Keith, although Mr. Walker indicated cellophane was used far more than Saran. Mr. Mollett, who was 64 years old when his deposition was taken, had

spent his entire career in the meatpacking industry. In the summer of 1955, he stayed about a month at the Keith plant in Salem as a troubleshooter, since the company was having cost and production problems. The reader is impressed by his recall of details. For example, he recalled that the Keith plant was on a 40-acre tract located near Salem. When asked what kind of thermometers he used to check meat temperatures, he replied, "Little round ones that you get from Griffith Laboratories." He recognized the packaging material as Saran by its texture, feel and stretch factor, in addition to the manufacturers' representations that it was Saran. Mr. Mollett insisted that the meat not be chilled; when it arrived at the Keith plant (the animals were slaughtered at Valley Dale, some two miles away) and when it was packaged, the temperature was from 86 to 92 degrees. From this temperature, Mollett deduced that the meat could not have been as much as four hours old. He recognized 80° as a critical temperature because of oil separation that began below that temperature, and was aware of the importance of rapid processing:

Q. Now why is the time element—I thought before it was the temperature element that was important?

A. The time and temperature would be the two elements governing it.

Mr. Mollett stated that if the warm sausage were allowed to stand, the product was likely to develop gassing problems; that is, carbon dioxide gas would be generated inside the Saran package, causing it to balloon and to be rejected by shoppers. In his words, " . . . anytime it would sit longer than 90 minutes without immediate processing, you are subject to creating a gassy condition or laying the base for a gassy condition to begin." Another hazard of delay, he said, is that the meat might become discolored. In summary, Mr. Mollett testified, "Pork products—the quicker you can handle them and the quicker you can

refrigerate them, the more of the adverse elements you keep from happening."

Mr. Walker, who was with Keith much longer than Mr. Mollett, testified at the trial that the elapsed time from slaughter to packaging was one to one and a half hours, and the meat temperature at the time of packaging was as high as 85 to 90°. He remembered using one shipment of 50,000 Saran bags for packaging sausage that was sold at retail. Although Mr. Mollett said no problems were encountered with the Saran-packaged sausage while he was at Keith, Mr. Walker testified that the rate of returned product due to gassiness was somewhat higher than for cellophane-packaged sausage.[5]

When Mr. Mollett signed the transcript of his deposition, he added a puzzling disclaimer: "All references to hog slaughter at Keith Sausage Company during my time at that plant are in error and are confused with operations at Montgomery." Bird naturally seizes this opportunity to discredit Mr. Mollett's testimony, which it says is worthless. I do not find it worthless. Considering that Mr. Mollett and Mr. Walker were asked about operations that occurred some 15 years previously, I think the minor discrepancies in their versions are attributable to the passage of years and are far outweighed by the similarities. But assuming that Mr. Mollett's recollections were of the operations at Montgomery, Alabama (where he was manager of the Frosty Morn Meats plant in 1955 and 1956), they still present strong evidence of a prior use of the patented process.

Finally, Owens attempted to prove that Bird itself used the patented process before the critical cutoff date of August 10, 1959. While the evidence of this prior use is more circumstantial than the evidence concerning the Rice and Keith operations, it nevertheless is worth reviewing. For one thing, Owens introduced in evidence an acknowledgment dated July 8, 1959, from Milprint, Inc., a manufacturer of packaging for meatpackers, showing an order for 100,000 two-pound sausage bags made of Saran-coated cellophane to be sent to Bird's plant at Pekin, Illinois. The order specified that half the bags—enough to package 50 tons of sausage—were to be sent as soon as possible, but within 7 to 17 days, and the remainder 30 days later. The acknowledgment also bears in the space for special instructions this note: "Watch backseals and watch out for blocking—complaint on previous job on both these points." This document is weighty evidence that Bird was packaging its sausage in Saran well before August 10, 1959—else why the reference to a "previous job" and why the rush to ship 50,000 bags within 17 days? Further, I was impressed by the testimony of Malcolm Kirtley, a former sales manager at Bird. He testified that he and Paul W. (Bill) Vogel spent seven to ten days sifting through Bird invoices dating back to 1943 after Bird's attorney in response to Owens' subpoena recommended a search for any invoices showing sales of sausage made by the patented process before August 10, 1959. During the search, Mr. Vogel found some bulletins and invoices dated before August 10, 1959, which caused him to exclaim, "My God, look at this!" and "It's a good thing we found this!" Mr. Kirtley said one document was a bulletin announcing the use of a new protective film and a longer shelf life of Bird sau-

---

5. Walker's testimony on this point is less than crystal clear, as the following exchange illustrates:

Q. Now, Mr. Walker, when Keith Brothers did package its fresh pork sausage in Saran, the product wouldn't keep up, wouldn't keep in the package, isn't that correct?

A. It didn't seem to keep as good, I will say, because we sold above 90% of it. We had no trouble, but the returns was [sic] greater than with the cellophane bag, and that's why we used it.

At another point, Walker said the company never had very many returns, and he seemed uncertain whether the returned Saran-packaged sausage had or had not discolored.

sage. The announcement said the film was Saran, or possibly OX511 (Saran-coated cellophane), as Mr. Kirtley recalled. He also recalled that one invoice was a billing to National Tea and described the sausage packaging as "a new protective type film." Mr. Kirtley said that Mr. Vogel put these documents in a separate file and he never saw them again. Later he resigned because of a conflict with Mr. Vogel, a fact which Bird emphasizes in urging me to disregard his testimony, and asserts that "undoubtedly" the documents were produced for Owens. If so, I feel certain they would have been produced at the trial. They were not, leading me to believe that Bird might have suppressed them intentionally. I would be considerably more reluctant to make such a serious accusation were it not for the testimony of an expert questioned document examiner, James Leroy Lewis, put on the stand by Owens. Mr. Lewis has testified in this court on many occasions, and usually leaves the courtroom with his testimony unshaken by cross-examination. So it was in this case. He cast considerable question on the credibility of three of Bird's exhibits. Mr. Paul W. (Bill) Vogel, one of the co-patentees, identified all three documents at two separate depositions as being part of his records of tests that he and his father (the other patentee) conducted at Bird to determine the critical characteristics of their invention. As numbered and admitted at the trial, they were plaintiff's exhibits 204, 205 and 208.

Exhibit 204 is a sheet of notebook paper with several lines of handwritten notes in pencil. It reads:

Nov. 1, 1959. After extensive shelf life test [sic] it was decided that we would be reasonably safe to start marketing fresh pork sausage in a sausage bag made of Saran coated cello —K cello or OX cello.

Mr. Vogel identified this as being in his writing. Mr. Lewis testified at the trial that in his opinion Exhibit 204 was written after Exhibit 205, which in his opinion had been directly above 204 in the notebook or tablet.

Exhibit 205 is a sheet headed "TEST" and is arranged in three columns labeled, from left to right, "Nos.", "Type Film", and "Date Pkged." Judging from the assigned numbers, there would appear to have been three test series. The dates packaged range from March 9, 1959, to July 12, 1961. Mr. Lewis testified that in his opinion the entire sheet, except for the last two lines, was written at the same time, rather than at various dates as the test batches were prepared.

■ Exhibit 208 is a typewritten sheet with information arranged in five columns labeled, from left to right, "Test No.", "Date Packed", "Type Film", "Date Sampled" and "Comment". Once again Mr. Lewis' examination led him to the opinion that the typed portion purporting to be results of taste tests was typed during one insertion of the paper into the typewriter, while a paragraph at the bottom of the page was typed at a different time on another typewriter. It reads:

The above product was made from hot boned hogs. The product was packaged within two (2) hours after the hog was slaughtered and the temperature of the meat was 90° at the time of packaging. Packages were placed in minus 10 deg freezer for freezing. Product was seasoned with our regular formula.

Bird's purpose in introducing these exhibits would appear to be to persuade the Court that the Vogels' decision to proceed with implementing the patented process was made only after lengthy testing and not until well after the statutory cutoff date. After Mr. Lewis' testimony at trial, and again in its brief, Bird disclaimed any reliance on Exhibit 204. Bird notes that other evidence shows Bird began selling sausage packaged according to the patent in September of 1959. Nevertheless, it appears to the Court that Bird might have altered

or manufactured some documentary evidence to bolster its contentions and refute Owens' evidence. This being the case, it is much more believable to the Court that Mr. Kirtley's testimony was true and that Bird intentionally withheld documentary evidence that would have harmed its case. While such instances are extremely rare in this court, it is elementary in the law of evidence that when a party destroys, fabricates or alters evidence, the Court properly may draw inferences unfavorable to the spoliator. *See generally* 29 Am.Jur.2d Evidence §§ 175–179 (1967); 31A C.J.S. Evidence §§ 151–155 (1964). Judge Learned Hand, after concluding that a ship's log had been "dressed up to excuse the ship's faults," commented forcefully:

> When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt. Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir. 1939).

In view of all the foregoing, the Court is convinced, beyond a reasonable doubt, that the process covered by the Bird patent was in public use or on sale in the United States more than one year before the date the patent was applied for; the patent is therefore declared invalid.

## II. OBVIOUSNESS OF THE PATENTED PROCESS

Replying to Owens' defense of obviousness, counsel for Bird told the Court in final argument:

> Essentially, their [Owens'] argument is that it was obvious to hot process in Saran. *We don't dispute that,* Your Honor. Several companies apparently tried it, but they couldn't do it because they didn't appreciate—recognize what the specific limitations were cited in these claims. [Emphasis added]

Congress permitted the obviousness defense in 35 U.S.C. 103:

> A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains . . .

At least one judge who weighed an obviousness defense decided that "[t]he test of obviousness under 35 U. S.C. § 103 is an objective one." Abington Textile Machinery Works v. Carding Specialists (Canada) Ltd., 249 F.Supp. 823, 829 (D.D.C.1965). In contrast, I feel the obviousness test is considerably less objective than that of prior use, which I have just considered. I agree with Judge Haynsworth that judges should be suspicious of their subjective notions and resist the temptation to conclude that an invention was obvious because, viewed with the aid of hindsight, it appears a simple answer to the problem. Allen v. Standard Crankshaft & Hydraulic Co., 323 F.2d 29, 34 (4th Cir. 1963). Nevertheless, I have decided the Bird patent was obvious in view of the prior art, and its time and temperature limits do not save it from invalidity.

Of the two most frequently mentioned items of prior art in this case, one was known to the patent examiner and the other was not. The one that was not cited to the examiner, and the one that Owens relies on heavily, was a short article published in 1953 in the trade magazine *Meat.* Although Mr. Bill Vogel quibbled about some details of the story —headlined "From Pen to Package in One Hour!"—they were of minor importance. For example, he noted that the reporter referred to a hog as "him" while in fact male hogs are not used in making fresh pork sausage. Nevertheless, it appears that the story could have been written only by one who toured Bird's sausage plant in or before 1953 and saw Bird processing sausage in approximately one hour from slaughter to packaging.

The article noted, "Among the many features which make this achievement possible has been the elimination of carcass chill, which Manager Ernest Bonk claims makes it the only plant in the country licensed for such operation." [6] The story does not mention either the meat temperature or the packaging material used.

The other important item of prior art is the Turner et al patent, Number 2,874,060 (patented February 17, 1959). Cited by the Patent Office in initially rejecting the patent in suit, Turner deals with a method of producing sausage and other ground meat products and packaging them in an air impermeable film. Saran is mentioned specifically several times in Turner. The principal difference between the Turner method and the Bird method is that in the former, the meat is fast frozen after hot boning. In the Bird process, as noted initially in this opinion, all processing is completed while the meat remains warm. Several of the seven claims in the Bird patent specify further time and temperature limitations, as recited in the margin.[7]

Allegations that time and temperature were critical have arisen time and again in a forum with particular expertise in weighing complicated matters, the Court of Customs and Patent Appeals. It will be helpful to review a few of them. For example, Application of Blondiau, 181 F.2d 223, 37 CCPA 1018 (1950) dealt with an old process, the manufacture of blast furnace slag cement. The applicant contended that it was critical to his improved process to restrict to five to ten minutes the time of calcining the gypsum that was later added to the cement. No calcining time was specified in the prior reference. In answering the question of whether it was invention to limit the firing period to from five to ten minutes, the Court wrote, "One skilled in the art would, we believe, use the proper time to obtain the best results from the calcination, and we believe this could be determined by mere experimentation." *Id.* at 225. The application was rejected.

The inventor in Application of Bersworth, 189 F.2d 996, 38 CCPA 1167 (1951) had been granted previous patents for a method of making certain

---

6. *Meat*, January 1953, p. 55.

7. What is claimed as new is as follows:

1. A method of preparing pork products, comprising the steps of: boning a freshly slaughtered carcass while still hot into trimmings; grinding desired carcass trimmings while still warm and fluent; mixing the ground trimmings while fluent and above approximately 80° F., mixing to be completed not more than approximately 3½ hours after the carcass has been bled and stuffing the warm and fluent mixed trimmings into air impermeable casings.

2. The method as defined in claim 1, wherein the trimmings are seasoned before mixing, mixing being completed within approximately one hour after the carcass has been bled and the internal temperature of the mixed and seasoned trimmings is not less than approximately 90° F.

3. The method as defined in claim 2, wherein the carcass is boned into trimmings within approximately 45 minutes after being bled while the internal temperature thereof is not less than approximately 100° F.

4. The method as defined in claim 3, wherein desired proportions of meat to fat components of the trimmings from the boned carcass are ground within approximately 55 min-

utes after the carcass has been bled while the internal temperature of the ground trimmings is not less than approximately 97° F.

5. The method as defined in claim 4, wherein the trimmings are settled within the casings for removal of voids and freezing the resulting product after approximately 1½ hours has elapsed since the carcass was bled with the internal temperature of the trimmings not less than approximately 90° F. the freezing interval being 2 hours during which time the internal termperature of the product is reduced to approximately 32° F.

6. The method as defined in claim 1, wherein the stuffed trimmings are permitted to settle within the casings.

7. A method of producing pork sausages comprising: bleeding a freshly slaughtered carcass; immediately hot boning the carcass following bleeding; grinding the boning products while fluent and hot into a state suitable for filling in sausage casings; filling air-impermeable casings with said ground boning products fresh, fluent and above 80° F. after the elapse of no more than 3½ hours following bleeding for freezing immediately thereafter so as to retain the fresh qualities thereof and avoid spoilage for a prolonged period of time.

acid that mentioned a temperature range of 30 to 100° C. In the appeal before the Court, the application had narrowed the permissible temperature range to 95 to 99° C., with 97° C. specified as optimum. Even though the applicant claimed new and improved results from his latest method, the Court agreed with the examiner that "what applicant has accomplished amounts to no more than experimentation with a known process to find the optimum operating condition." *Id.* at 1000. The application was rejected since the improvement was insufficient to show the "criticalness" of the specified temperature.

In Application of Aller, 220 F.2d 454, 42 CCPA 824 (1955), the patent application for a process for producing phenol was identical with the prior art except that the application specified lower temperatures and different acid concentrations. While the applicant argued that those changes were invention, the Patent Office contended that the changes were obvious. The Court wrote:

> Normally, it is to be expected that a change in temperature, or in concentration, or both, would be an unpatentable modification. Under some circumstances, however, changes such as these may impart patentability to a process if the particular ranges claimed produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art. . . .
> However, even though applicant's modification results in great improvement and utility over the prior art, it may still not be patentable if the modification was within the capabilities of one skilled in the art. . . .
> More particularly, where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *Id.* at 456.

> \*    \*    \*    \*    \*    \*

Any chemist reading the [prior art] could logically assume that higher yields might be obtainable, and by experimentally varying the conditions of temperature and acidity could find the most productive conditions. If it could be held that the skilled chemist would never think to reduce the temperature or increase the acid concentration, then it might be held that invention resides in so doing. . . . No invention is involved in discovering optimum ranges of a process by routine experimentation. *Id.* at 458.

The application was denied, since the Court held that the applicant's process was different in degree, not in kind, from the reference process and the criticality of the claimed ranges had not been shown.

Similarly, in Application of Budde, 319 F.2d 242, 50 CCPA 1491 (1963), the Court had before it an application in which, except for new time and temperature limitations, the essential elements were taught by the prior art. The Court rejected the application, writing:

> The recited ranges of reaction time and temperature have not been shown to be critical, or to produce any unexpected results. Only a difference in degree rather than in kind appears to have been produced. The recited reaction conditions constitute merely modifications of an old process which, we think, one skilled in the art would be capable of making, hence they do not patentably distinguish over the prior art. *Id.* at 246.

Bird maintains that there is "an overwhelming scientific basis" for each of the key ingredients in its patent: the Saran film, the minimum processing temperature of 80° and the maximum processing time of three and one-half hours. Lengthy expert testimony, in which the Court was educated about the existence and effects of psychrophiles, mesophiles and thermophiles (among other things) in sausage, was presented to prove *why* the limitations must be observed. However, Bird admits that as late as 1967 the inventors themselves did not understand the microbiology of their patented process. The time and temperature limits, according to Bird, were ar-

rived at after the Vogels (father and son) conducted two years of experiments in which they dared to disregard two fallacies that then prevailed among sausage makers: that fresh pork sausage could not successfully be packaged in Saran, and that the meat must be processed chilled for an extended shelf life. I have spoken earlier as to the doubt cast on the validity of the purported records of the Vogels' experiments by the testimony of the documents examiner, Mr. Lewis.

But, to paraphrase part of the *Aller* case, *supra,* I do not believe I can hold that *no* competent sausage manufacturer would have thought to increase the temperature and shorten the processing time—particularly in view of the age-old farm method of making sausage.

It follows, then, that in comparing the facts to the cases cited, the Bird patent is invalid on grounds of obviousness. This finding is an alternative to the finding of invalidity for prior use.

Owens' attorneys are requested to submit to the Court a proposed judgment, approved as to form by Bird's attorneys, in accordance with this opinion, which is submitted in lieu of formal findings of fact and conclusions of law.