568 F.2d 369
 197 U.S.P.Q. 134
 BIRD PROVISION CO., Plaintiff-Appellant Cross-Appellee,
v.
OWENS COUNTRY SAUSAGE, INC., Defendant-Appellee Cross-Appellant.
BIRD PROVISION CO., Plaintiff-Appellant Cross-Appellee,
v.
Clifford B. OWENS et al., Defendants-Appellees Cross-Appellants.
 No. 75-3412.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 24, 1978.
 
 Harvey B. Jacobson, Jr., Washington, D. C., Allen Butler, Dallas, Tex., for plaintiff-appellant cross-appellee.
 Carlisle Blalock, D. Carl Richards, Dallas, Tex., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Northern District of Texas.
 Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 Plaintiff Bird Provision Company claims that Owens Country Sausage, Inc. and two of its officers infringed on Bird Provision's patented process for making fresh pork sausage. Defendants admit infringement, but contend that the Bird Provision patent is invalid on several grounds. The district court declared the patent invalid on the grounds of prior public use and obviousness, and Bird Provision appealed. On the basis of the district court's findings and decision, Bird Provision Co. v. Owens Country Sausage, Inc., 379 F.Supp. 744 (N.D.Tex.1974), we affirm.
 
 I. Background
 
 2
 The ancient art of making fresh pork sausage has changed but little over the centuries. Basically, the meat is stripped from the slaughtered animal, ground and seasoned, and packaged uncooked. Under what the parties term the "conventional" method of sausage processing, the carcass is chilled overnight at 35-40o and processed while cool into air-permeable sausage casings, such as cloth bags or polyethylene films. Sausage "hot-processed" according to the Bird Provision patent, however, is packaged into air-impermeable containers before the meat temperature falls below 80o fahrenheit.[1] Bird Provision recognizes four requirements as the key elements of its patented process: the meat must be processed while it retains a temperature of at least 80 and preferably 90 degrees; packaging must be completed within 31/2 hours, and preferably within 1 hour, from the time of slaughter; the meat must be "warm and fluent" when packaged; and it must be packaged into an air-impermeable material, such as the well-known saran film. Bird Provision claims that processing fresh pork sausage according to the terms of its patent doubles the refrigerated shelf life of the packaged product and indefinitely prolongs shelf life when frozen.
 
 
 3
 Fresh pork sausage is unusually susceptible to rancidity spoilage, discoloration, and bacterial spoilage. Rancidity spoilage and discoloration are caused by oxygen in prolonged contact with the meat. Fresh pork sausage, no matter how it is processed, necessarily contains some oxygen, either dissolved in the meat itself or entrapped in the air pockets created during the grinding and mixing stages. Therefore spoilage will not be prevented by simply protecting the meat from external oxygen by air-impermeable packaging. If rancidity and discoloration are to be eliminated, the oxygen dissolved and entrapped within the meat must somehow be eliminated.
 
 
 4
 According to Bird Provision, the internal oxygen can be eliminated by packaging the meat while it is "warm and fluent," which requires processing within 31/2 hours and while the meat retains no less than 80o of its original 102-104o temperature. Air pockets tend not to form when the meat is processed in a warm and fluent state. More importantly, the warm and fluent meat contains enzymes (live tissues) that metabolize (consume) residual internal oxygen.
 
 
 5
 Bacterial spoilage results from the growth of microorganisms in the meat. Since freezing stops all bacterial growth, bacterial spoilage is not a problem in frozen storage, only at temperatures above freezing. Fresh pork sausage can be held at high temperatures for a period of 3 to 4 hours before appreciable bacterial growth begins. Therefore, the Bird Provision process is able to control bacterial spoilage by controlling the initial level of psychophillic bacteria (those which grow at temperatures below 50o ) and by packaging the sausage within 31/2 hours.
 
 
 6
 Defendants do not dispute the validity of Bird Provision's claims, nor do they deny that the processing method currently in use at Owens Country Sausage, Inc. infringes the Bird Provision patent. They argue, however, that the Bird Provision patent is invalid on four grounds: (1) prior public use and sales, (2) obviousness, (3) vagueness and indefiniteness, and (4) fraud on the United States Patent Office in obtaining the patent. The district court held the patent invalid for prior public use and obviousness and did not consider defendants' alternative allegations of vagueness and fraud. Because we affirm the district court's findings as to prior public use and obviousness, it is unnecessary to reach defendants' contention, raised on cross-appeal, that the district court erred in failing to hold the patent invalid for vagueness and fraud on the Patent Office.
 
 II. Patent Validity
 
 7
 The ultimate question of patent validity is one of law. That conclusion of law, however, must be based on the results of several basic factual inquiries. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1960); Metal Arts Co. v. Fuller Co., 389 F.2d 319 (5th Cir. 1968). Findings of fact in patent cases, no less than in other areas of law, are tested on appeal under the strictures of the "clearly erroneous" review standard of Fed.R.Civ.P. 52(a). Hughes Tool Co. v. Varel Mfg. Co., 336 F.2d 61 (5th Cir. 1964). Indeed, because patent cases so frequently involve conflicts in the evidence, especially in expert testimony, they seem particularly suited for the review limitations imposed by Rule 52(a). See American Seating Co. v. Southeastern Metals Co., 412 F.2d 756 (5th Cir. 1969).
 
 
 8
 Federal statutes delineate three specific requirements for patentability: utility, 35 U.S.C.A. § 101; novelty, 35 U.S.C.A. § 102; and nonobviousness, 35 U.S.C.A. § 103. The absence of any one of these requirements negatives the existence of any rights in the inventor and is a complete bar to compensation. See Hobbs v. United States, 376 F.2d 488, 493 (5th Cir. 1967). Owens Country Sausage does not assail the utility of Bird Provision's patented process, but does contend that the process is obvious and lacks novelty.
 
 A. Novelty
 
 9
 Novelty is negated and the patent invalid if "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent . . . ." 35 U.S.C.A. § 102(b). Application for the Bird Provision patent was made on August 10, 1960. The patent is therefore invalid if a single public use of the process or sale of its product took place prior to the "critical date," August 10, 1959.
 
 
 10
 The bar to patent validity thrown up by § 102(b) is basically a reflection of the public policy that an inventor should not be permitted to extend the effective duration of his patent monopoly through covert commercial exploitation of his invention. Kardulas v. Florida Machine Products Co., 438 F.2d 1118 (5th Cir. 1971). Thus, a public use may be established either by showing a nonsecret, nonexperimental use of the process or by showing that the inventor himself used the process primarily for trade and profit prior to the critical date, regardless of whether his use was secret. In re Yarn Processing Patent Validity Litigation, 498 F.2d 271 (5th Cir.), cert. denied sub nom. Sauquoit Fibers Co. v. Leesona Corp., 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).
 
 
 11
 It is clear that the infringer who assails the validity of a patent bears the burden of proof. White v. Mar-Bel, Inc., 509 F.2d 287, 291 (5th Cir. 1975). The weight of that burden of proof, however, is not so clear. See Stamicarbon, N.V. v. Escambia Chemical Corp., 430 F.2d 920, 924 (5th Cir.) ("(T)he authorities are in a morass of conflict."), cert. denied, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Hobbs v. United States Atomic Energy Comm'n, 451 F.2d 849, 856 (5th Cir. 1971) ("(T)his Court has employed varying statements of the necessary quantum of proof."). This case does not turn on a resolution of this inconsistency, for it is clear that these defendants shouldered the most onerous of standards. The trial court was convinced "beyond a reasonable doubt" that the Bird Provision process was anticipated by four separate instances of prior public use.
 
 
 12
 First, the trial court found that the Bird Provision process has been used on American farms for generations. Generally, in late fall a farm family would slaughter a hog for winter sausage. The carcass would be boned, the trimmings ground and seasoned, and patties formed and put into crocks or cloth bags. The crocks were then sealed by a layer of grease, which, when hardened, rendered the container air-impermeable. The cloth bags were coated with paraffin to maintain freshness. The process, according to two witnesses, was generally completed within 31/2 hours after slaughter and while the temperature of the meat was above 80o . Bird Provision's own expert witness testified that assuming the air-impermeability of the lard sealant, this farm process would fall within the teachings of the Bird Provision patent if completed within 31/2 hours and while the meat was still above 80o .
 
 
 13
 The second public use found by the district court took place in Lee's Summit, Missouri, at the R. B. Rice Sausage Co. during the mid-1950's. The president of that concern, Harold Rice, testified that in 1955 and 1956 the Rice Co. process from slaughter to package took from 1 to 3 hours and that the product was packaged into saran at 75o to 85o . The deposition testimony of two employees of the Kartridge Pak Machine Co. is corroborative. One of these men had witnessed "warm and soupy" sausage being packaged into saran by a Kartridg-Pak machine in early 1956. The other Kartridg-Pak employee had observed Rice's sausage-making operation in 1955 and knew that at least some of the hogs were processed in 3 hours or less and at a temperature of 80o or higher. This testimony is further buttressed by documentary evidence in the form of invoices, dated between 1955 and 1956, for saran film from Tee-Pak, Inc., a manufacturer of artificial casings for the meat industry.
 
 
 14
 The third public use found by the court was in 1955 by the Keith Brothers Sausage Co. of Salem Virginia. Don Walker was the sausage foreman at Keith from 1952 to 1956. Around September 1954 the Keith plant was purchased by Lorenz Neuhoff, who owned the Valley Dale Packers plant about 2 miles away. Walker testified that prior to the takeover and for a short while thereafter, the Keith plant slaughtered its own hogs and hot-processed the sausage into cellophane bags "in not more than an hour to an hour and a half" and while the meat was 80o to 90o . He recalled that Keith had at some point used a shipment of 50,000 saran bags for packaging the hot-processed sausage. These packages were sold at retail, although Keith experienced some returns due to a bloated appearance caused by "gassing." Shortly after Mr. Neuhoff took over the plant, the hogs for the Keith plant were slaughtered at the Valley Dale plant and then sent to Keith to be processed into sausage and bagged. Walker testified that it took a maximum of 21/2 hours to get the product from slaughter at Valley Dale into the bag at Keith and that the product was usually packaged at 80o to 90o temperatures.
 
 
 15
 Ray C. Mollett was employed as a consultant at the Keith plant for about a month during the summer of 1955. In remarkable detail he recalled the Keith operation. Although Mollett was not able to state how much time elapsed from the slaughter and boning of the hogs at the Valley Dale plant to the arrival of the metal drums of meat at Keith, he did know that when the hogs were slaughtered and boned after lunch, the boned meat was received at around 2:15 to 2:30 in the afternoon at Keith. The temperature of the boned meat was checked by thermometer upon arrival at the Keith plant and was 86o to 96o . The meat was immediately placed in the grinder, mixed, and packaged in saran bags. The temperature of the packaged sausage, measured with a needle-type thermometer, also ranged between 86o and 92o . That saran was used as a packaging material during this time is corroborated by a plate book indicating that in 1955 Tee-Pak, Inc. received an order from Valley Dale to print a three-color design on saran packaging material. Keith ordered all of its sausage bags through Valley Dale.
 
 
 16
 Mr. Mollett's deposition closed with the following statement: "All references to hog slaughter at Keith Sausage Company during my time at that plant are in error and are confused with operations at Montgomery." After noting this "puzzling disclaimer," the district court stated:
 
 
 17
 Bird naturally seizes this opportunity to discredit Mr. Mollett's testimony which it says is worthless. I do not find it worthless. Considering that Mr. Mollett and Mr. Walker were asked about operations that occurred some 15 years previously, I think the minor discrepancies in their versions are attributable to the passage of years and are far outweighed by the similarities. But assuming that Mr. Mollett's recollections were of the operations at Montgomery, Alabama (where he was manager of the Frosty Morn Meats plant in 1955 and 1956), they still present strong evidence of a prior use of the patented process.
 
 
 18
 Bird Provision Co. v. Owens Country Sausage, Inc., 379 F.Supp. at 749.
 
 
 19
 Bird Provision contends that even if the patented process was used on American farms and at Rice and Keith Brothers and did inadvertently increase the shelf life of the product, "accidental results, not intended and not appreciated, do not constitute anticipation." Eibel Process Co. v. Minnesota & Ont. Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523 (1923). This well-known rule, however, is inapplicable to the instant facts.
 
 
 20
 In Eibel Process the challenged patent taught a method for greatly improving the efficiency of the Fourdrinier paper-making machine. The main feature of the Fourdrinier machine was an endless wire cloth sieve, the "paper-making wire," which passed over a series of rolls at a constant speed. At one end of the machine, a mixture of wood pulp fibres and water, the "paper-making stock," was discharged in a constant stream upon the wire. When the machine was operated at speeds in excess of around 500 feet per minute, the wire tended to travel faster than the stock, thus creating a rippling effect in the stock and defects in the end product. Eibel discovered that by tilting the wire 12 inches, the movement of the stock was hastened by the gravitational force of the downhill flow. The production speed of the machine was consequently increased without harming the quality of the paper. He patented his discovery. The Supreme Court held that an earlier paper-making machine employing at most a 3-inch tilt for drainage purposes did not constitute a prior use. The Eibel invention was distinguished in two ways: the wire was tilted to accomplish a different purpose and the degree of pitch was much greater. The Court further held that any increase in speed achieved in the earlier machine because of the 3-inch drainage tilt was accidental, unintentional, and unappreciated and therefore did not anticipate Eibel.
 
 
 21
 The Eibel Court relied on Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1881), which involved a patented process for separating fats and oils into their component parts. In Tilghman the Court held that preexisting processes for soap and candle making did not anticipate the patented process despite the accidental formation of fat acid.
 
 
 22
 They revealed no process for the manufacture of fat acids. If the acids were accidentally and unwittingly produced, whilst the operators were in pursuit of other and different results, without exciting attention and without its even being known what was done or how it had been done, it would be absurd to say that this was an anticipation of Tilghman's discovery.
 
 
 23
 Id. at 711-712.
 
 
 24
 The rule applied in Tilghman and Eibel Process is founded on the policy of rewarding persons who teach the public how to perform processes and construct things that nobody else knows how to perform or construct. 1 A. Deller, Deller's Walker on Patents § 67 at 319 (2d ed. 1964). When the process has been in well-established use, however, novelty is destroyed even though some of the benefits of the process are not recognized or appreciated. See Celite Corp. v. Dicalite Co., 96 F.2d 242 (9th Cir.), cert. denied, 305 U.S. 633, 59 S.Ct. 101, 83 L.Ed. 407 (1938); 1 A. Deller, Deller's Walker on Patents § 59 at 271, § 67 at 321 (2d ed. 1964). In the instant case there is substantial evidence that the identical process claimed by the Bird Provision patent had previously been used for the same purpose: producing and preserving fresh pork sausage. The prior users did not employ the process by chance. They were not unaware of the fact that they had hot-processed the meat into saran and other air-impermeable containers. That the prior public users did not understand or appreciate the shelf life implications of the process does not save the Bird Provision patent from anticipation under § 102(b), for the discovery of the process' shelf life implications involved nothing that was new in its use or method of application. See Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 18-19, 12 S.Ct. 601, 36 L.Ed. 327 (1892).
 
 
 25
 Bird Provision, noting that both Rice and Keith Brothers discontinued their use of saran, next contends that the alleged prior public uses come within the rule that "(a)n inoperable invention or one that fails to achieve its intended result does not negative novelty." United States v. Adams, 383 U.S. 39, 50, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966). In Adams the infringer challenged, for want of novelty, the validity of a patent teaching a water-activated battery using magnesium cuprous chloride electrodes. The patent alleged to anticipate the Adams battery taught the use of magnesium electrodes in an electrolyte of alcoline, chloro-chromate, or a permanganate strengthened with sulphuric acid. Attempts by an expert to assemble the battery alleged to anticipate were met by fire and explosions. In contrast, the Bird Provision process was successfully performed by earlier users, and this is alone sufficient to negate novelty. Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 387, 72 L.Ed. 610 (1928) ("A process is reduced to practice when it is successfully performed.").
 
 
 26
 Neither does Bird Provision's theory gain support from the cases of Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir.), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955) and Stamicarbon, N.V. v. Escambia Chemical Corp., 430 F.2d 920 (5th Cir.), cert. denied, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). In Stamicarbon the alleged infringer defended under § 102(b) on the theory that the patented process in issue had been "on sale" in the United States more than one year before the date of the patent application. This Court merely noted that since the process alleged to anticipate did not even work prior to the critical date, it had not been on sale prior to the critical date. In Lyon, the Second Circuit rejected the infringer's defense of prior public use, holding that the earlier process had been "abandoned . . . as soon as it emerged from the stage of experiment." Lyon v. Bausch & Lomb Optical Co., 224 F.2d at 534. In this case the evidence shows that the instances of prior use were not mere abandoned laboratory experiments. First, the prior uses lacked an experimental nature since the process was employed openly in the ordinary course of activities of large companies and innumerable farms. See Rosaire v. Baroid Sales Div., Nat'l Lead Co., 218 F.2d 72, 75 (5th Cir.), cert. denied, 349 U.S. 916, 75 S.Ct. 605, 99 L.Ed. 1249 (1955); 1 A. Deller, Deller's Walker on Patents § 69 at 328 (2d ed. 1964). Second, although a small percentage of returns due to "gassing" had been experienced, the decision to return to conventional packaging materials was also influenced by the comparatively high cost of saran, and by mechanical difficulties encountered in sealing the saran film. Novelty "is denied to old things, without regard to the circumstances which caused their earlier applications to be unsatisfactory or their use to be abandoned." Pennington v. National Supply Co., 95 F.2d 291, 294 (5th Cir. 1938); see 1 A. Deller, Deller's Walker on Patents § 67 at 327 (2d ed. 1964).
 
 
 27
 The fourth instance of prior public use was found to have occurred at the Bird Provision Company itself. The district court based its conclusion on circumstantial evidence. First, a customer acknowledgment dated July 8, 1959, showed an order from Bird Provision for 100,000 2-pound saran bags. The order requested that one-half the bags be sent as soon as possible, but within 7 to 17 days, and complained of faulty backseals on a previous job. The court considered this weighty evidence that Bird Provision had packaged in saran before August 10, 1959. Second, a former employee of Bird Provision testified that while he and Bill Vogel, then general manager of Bird Provision, were conducting a search through company records pursuant to a subpoena duces tecum, Vogel discovered some damaging documents, including a bulletin dated before August 10, 1959, announcing Bird Provision's use of saran and the resultant longer shelf life of Bird Provision sausage. These documents did not appear at trial, which led the district court to believe that Bird Provision had intentionally withheld them. The court was further persuaded to this conclusion by the testimony of an expert document examiner, who indicated that three exhibits introduced by Bird Provision had been manufactured to bolster its contentions.
 
 
 28
 Although the district court correctly noted that unfavorable inferences may be drawn against a party found to have destroyed, fabricated, or altered evidence, the evidence of misconduct is equivocal and capable of innocent explanations. Likewise, the customer acknowledgment cited by the court does not reveal whether the saran bags ordered for no later than July 25 delivery were actually used prior to August 10, 1959; nor does it indicate what they might have been used for; nor does it disclose whether the "previous job" related to an order for saran as opposed to some other variety of packaging material. On the whole, the circumstantial evidence of prior public use at Bird Provision probably falls short of the stringent quantum of proof necessary to invalidate a patent under § 102(b). The district court's findings regarding sausage-making activities on American farms and at Rice and Keith Brothers, however, are not clearly erroneous. The record supports the conclusion that these activities constitute prior public uses under § 102(b).
 
 
 29
 On the issue of prior public use, the district court concluded:
 
 
 30
 In view of all the foregoing, the Court is convinced, beyond a reasonable doubt, that the process covered by the Bird patent was in public use or on sale in the United States more than one year before the date the patent was applied for; the patent is therefore declared invalid.
 
 
 31
 379 F.Supp. at 751. Bird Provision argues it is impossible to determine from this language which, if any, of the four separately alleged prior public uses, standing alone, constituted an anticipation of its patented process. The district court's memorandum opinion, fairly read, shows that each of the four instances of prior public use discussed by the court was found to anticipate the process claimed by the Bird Provision patent.B. Obviousness
 
 
 32
 In addition to being novel, an improvement over the prior art must also be nonobvious in order to qualify for patent protection. The standard for disqualifying an improvement for obviousness was codified by Congress in 35 U.S.C.A. § 103.
 
 
 33
 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
 
 
 34
 Although the question of obviousness is one of law, its resolution requires inquiry into three basic factual areas. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).
 
 
 35
 Bird Provision argues that the district court failed to analyze the obviousness issue in the manner prescribed by the Supreme Court in Graham. On a fair reading of the entire opinion, it is clear that the district court did go through the three-tier Graham analysis, although the findings are not as specific and particularized as is desirable. See American Seating Co. v. Southeastern Metals Co., 412 F.2d 756 (5th Cir. 1969).
 
 
 36
 Bird Provision does not dispute that the four essential criteria of its process patent were each, by themselves, disclosed in the prior art. In view of the numerous prior art references cited by defendants, Bird Provision could hardly have contended otherwise. The district court discussed two evidences of the prior art, a 1953 article published in the trade magazine Meat and a prior patent issued to Turner, which, when read together, disclose the essential elements of the Bird Provision process.
 
 
 37
 The Meat article, entitled "From Pen to Package in One Hour!," describes with amazement Bird Provision's "straight-through" sausage process by which live hogs were converted into 1-pound bags of sausage in approximately 1 hour. Although the article mentions neither the packaging material used nor the temperature of the meat when packaged, it does relate that the "(h)og is slaughtered, cut, ground and mixed for sausage, and packaged before cooling." As the Bird Provision patent tells us, sausage meat processed into the package approximately 1 hour from slaughter will retain approximately 92o of its original internal body temperature. Since fresh ground pork is necessarily "warm and fluent" if processed within 31/2 hours and before the meat temperature drops below 80o , three of the four essential criteria of the Bird Provision process are disclosed in the Meat article. This important element of prior art was not before the Patent Office when the Bird Provision patent was issued. Consequently, the presumption of validity otherwise attaching to the patent is weakened, if not destroyed. American Seating Co. v. Southeastern Metals Co., 412 F.2d 756 (5th Cir. 1969).
 
 
 38
 The fourth essential process criteria, packaging in air-impermeable containers, is disclosed by the Turner patent, which was cited by the Patent Office in initially rejecting the patent in suit. The Turner patent deals with a method of producing meat products, including sausage, and packaging them in air-impermeable film. Saran is specifically mentioned as a suitable packaging material.
 
 
 39
 Bird Provision contends that although the elements of its process are old, the combination of those elements results in a new and patentable process. The combination, argues Bird Provision, achieves a synergistic result a result greater in effect than the sum of the several effects of the individual elements and therefore satisfies the standards of patentability appropriate for combination patents. See Sakraida v. Ag Pro, Inc., 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152-153, 71 S.Ct. 127, 95 L.Ed. 162 (1950). There is no need to engage in an exacting search for synergism, for Bird Provision's combination lacks a more elementary requirement of patentability: novelty. Not only are the elements of Bird Provision's combination old, the combination itself is old. At least two major sausage producers and a host of farmers had openly employed the combination of hot processing sausage into air-impermeable containers within the time and temperature limits prescribed by the Bird Provision patent.
 
 
 40
 It follows then that the only information brought to light by Bird Provision in the venerable art of making fresh pork sausage was the critical importance of completing the "straight-through" process within approximately 31/2 hours and while the meat retains at least 80o of its original temperature. Certainly one skilled in the art of processing meat products would recognize that fresh pork sausage cannot remain exposed to the open air indefinitely. That spoilage is hastened by the natural action of bacterial agents in the air is an elementary principle of microbiology obvious to anyone who has relaxed too long before wrapping and refrigerating leftovers from the evening meal. The 1953 Meat article indicates that the state of technology in the late 1950's dictated the preferred time and temperature limits claimed by the Bird patent: converting a live hog into packaged sausage ready for the grocer's shelf took approximately 1 hour. From this starting point one skilled in the art needed merely to conduct sausage-processing experiments in time intervals successively longer than 1 hour and at temperatures successively lower than 90o until the product demonstrated unsatisfactory shelf life properties. See Application of Clinton, 527 F.2d 1226 (Cust. & Pat.App.1976). Ascertaining the maximum time and minimum temperature limits claimed by the Bird Provision patent was the work of the patient experimenter skilled in the art, not the inventor. See, e. g., California Research Corp. v. Ladd, 123 U.S.App.D.C. 601, 608, 356 F.2d 813, 820 (1966) ("A mere location of optimum conditions and characteristics, however useful, is said not to warrant a patent monopoly."); Application of Aller, 220 F.2d 454, 456, 42 C.C.P.A. 824 (1955) ("(W)here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.").
 
 III. Attorney Fees
 
 41
 Under 35 U.S.C.A. § 285 a court may, in exceptional cases, award attorney fees to the prevailing party in patent litigation. The record contains no indication that Bird Provision did not proceed in this litigation under a bona fide belief that its patent claims were valid. This, therefore, is not an "exceptional case" calling for an award of attorney fees. Parker v. Motorola, Inc., 524 F.2d 518, 535 (5th Cir. 1975), cert. denied, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).
 
 IV. Conclusion
 
 42
 We hold Bird Provision's patent invalid for prior public use under 35 U.S.C.A. § 102(b) and for obviousness under 35 U.S.C.A. § 103, but decline to award attorney fees under 35 U.S.C.A. § 285. It is therefore unnecessary to reach defendants' cross-appeal contentions regarding the patent's indefiniteness and Bird Provision's alleged fraud on the Patent Office.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 The Bird Provision patent claims as new:
 
 
 [1]
 A method of preparing pork products, comprising the steps of: boning a freshly slaughtered carcass while still hot into trimmings; grinding desired carcass trimmings while still warm and fluent; mixing the ground trimmings while fluent and above approximately 80o F., mixing to be completed not more than approximately 31/2 hours after the carcass has been bled and stuffing the warm and fluent mixed trimmings into air impermeable casings
 
 
 [2]
 The method as defined in claim 1, wherein the trimmings are seasoned before mixing, mixing being completed within approximately one hour after the carcass has been bled and the internal temperature of the mixed and seasoned trimmings is not less than approximately 90o F
 
 
 [3]
 The method as defined in claim 2, wherein the carcass is boned into trimmings within approximately 45 minutes after being bled while the internal temperature thereof is not less than approximately 100o F
 
 
 [4]
 The method as defined in claim 3, wherein desired proportions of meat to fat components of the trimmings from the boned carcass are ground within approximately 55 minutes after the carcass has been bled while the internal temperature of the ground trimmings is not less than approximately 97o F
 
 
 [5]
 The method as defined in claim 4, wherein the trimmings are settled within the casings for removal of voids and freezing the resulting product after approximately 11/2 hours has elapsed since the carcass was bled with the internal temperature of the trimmings not less than approximately 90o F. the freezing interval being 2 hours during which time the internal temperature of the product is reduced to approximately 32o F
 
 
 [6]
 The method as defined in claim 1, wherein the stuffed trimmings are permitted to settle within the casings
 
 
 [7]
 A method of producing pork sausages comprising: bleeding a freshly slaughtered carcass: immediately hot boning the carcass following bleeding; grinding the boning products while fluent and hot into a state suitable for filling in sausage casings; filling air-impermeable casings with said ground boning products fresh, fluent and above 80o F. after the elapse of no more than 31/2 hours following bleeding for freezing immediately thereafter so as to retain the fresh qualities thereof and avoid spoilage for a prolonged period of time
 Bird Provision maintains that the district court erred in invalidating the patent because it did not focus attention on the patent's claims. In particular, Bird Provision notes that the "settling step" of claim 6 and the "freezing step" of claim 7 were not mentioned in the court's memorandum opinion. The evidence specifically shows that the freezing step of claim 7 was employed by prior public users, and it seems clear that some degree of "settling," which is not in any way defined in claim 6, must occur anytime a warm and fluent substance is placed in a container. The district court's findings of prior public use and obviousness clearly extended to all seven claims of the Bird Provision patent.